Filed 10/14/24  P. v. Escalante CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B323966 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA149219) |
| v. | |
| ENZO ESCALANTE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Roger Ito, Judge.  Affirmed as modified, remanded with directions.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy

Attorney General, Charles S. Lee, Kathy S. Pomerantz and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

A jury convicted Enzo Escalante of first and second degree murder (Pen. Code, § 187, subd. (a); counts 1 & 3),[1] two counts of possession of a concealed firearm by a prohibited person (§ 25400, subd. (a)(2); counts 2 & 5) and second degree robbery (§ 211; count 4).  On appeal, Escalante contends the trial court erred in denying his request to sever the two murder charges, which he asserts were unrelated.  He further argues that the prosecutor violated the California Racial Justice Act (§ 745) (Racial Justice Act) by commenting that Escalante's skin was lighter at trial than in photos taken near the time the crimes were committed, six years earlier.  Finally, Escalante contends the court erred in imposing two life without possibility of parole (LWOP) sentences on count 3 and the abstract of judgment incorrectly fails to reflect that the sentence on count 5 was stayed.

The Attorney General concedes the sentencing errors and also observes that the prosecution erred in charging Escalante with the multiple murder special circumstance on both murder counts.  He disputes Escalante's remaining contentions.

We modify the judgment to impose only one LWOP sentence on count 3.  We also strike one of the multiple murder special circumstance findings and direct the trial court to amend the abstract of judgment to reflect the court's oral pronouncement with respect to count 5.  We otherwise affirm the judgment.

———————————————

[1]     All undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND
### *The Murder of Christopher Ramirez*

Isaac Ramirez was 16 years old when his brother, Christopher Ramirez, was killed on June 27, 2016.[2] That day, Isaac and his friend, Eddie, were heading to a marijuana dispensary and to get donuts. As they were walking, Isaac observed a stationary black Nissan. Two men were standing outside the car and one was seated in the driver's seat. While Isaac and Eddie were crossing the street, one of the men standing outside the Nissan asked, "Where are you from?" Isaac understood the man to be asking whether Isaac belonged to a gang. He replied, "I don't bang. I'm not from a gang." The man stated he was from the KAM gang and asked, " 'Are you sure you don't write? You don't bang?' " Isaac understood the first question was asking whether he was part of a tagging crew. He replied, "No, I don't write or bang." Eddie remained silent. The man told Isaac to go to a nearby alley. Isaac began heading there when Eddie stopped him and told him to go to the marijuana dispensary.

Isaac and Eddie entered the dispensary and took a seat. While inside, Eddie called someone. Escalante, the driver of the Nissan, followed them in. Escalante was 18 years old at the time. He sat down beside Isaac and asked, in an angry tone of voice, " 'What do you bang? What do you write?' " He repeated the questions at least five times. Isaac replied each time that he did not bang or write. Escalante grew increasingly angry. Meanwhile, Isaac felt his phone vibrating but ignored it. He

---

[2]     Because Christopher and Isaac Ramirez share the same last name, we refer to Isaac by first name only. No disrespect is intended.

3

feared he was going to be beaten up or shot. At some point, a security guard told anyone who did not have business in the dispensary to leave. Before going, Escalante touched Isaac on the shoulder and told him, " 'I'll wait for you outside.' " Isaac finally answered his phone. It was Ramirez, who told Isaac to come outside. Isaac obeyed and saw Ramirez near the donut shop. Isaac approached and told his brother what happened with Escalante. Ramirez ran towards the Nissan. Isaac followed.

Escalante was seated in the driver's seat of the Nissan and was watching Ramirez and Isaac. Ramirez approached the driver's side of the vehicle and punched Escalante in the face. Isaac then heard a gunshot. Ramirez immediately ran across the street and fell to the ground. He had a bullet wound in his chest.

Isaac had never seen Escalante or the other men before that evening. Before hearing the gunshot, he was not aware that anyone was armed. Ramirez did not have any weapon in his hand when he approached Escalante and was unarmed as far as Isaac knew. Escalante left the scene before law enforcement arrived.

Ramirez was 21 years old at the time of his death. He was shot twice, once in the left chest and once in the forearm. The chest wound was fatal.

A detective responded to the scene and recovered video from several businesses in the area. Sergeant Robert Martindale, a homicide investigator with the Los Angeles County Sheriff's Department, reviewed the videos. Martindale had previously interviewed Escalante and recognized him in a video taken inside the marijuana dispensary on the day of the shooting. Video also showed Escalante speaking with Isaac in the dispensary, as well

4

as individuals running away moments before Ramirez staggered across the street.

### The Murder of Jeremiah Bonilla

On July 6, 2016, Cruz Curiel was at home when an old acquaintance, Alexis Anguiano, arrived with Escalante. They had a bicycle with them. Anguiano told Curiel they just wanted to hang out.

While the three were smoking marijuana, Escalante pulled out a semi-automatic handgun from his waistband. Escalante cleaned the gun, then handed it to Anguiano, and took pictures of Anguiano with the gun. Escalante said he had the gun for his protection and told them, " 'Fool, I'm banging and there are a lot of fools out to get me.' " He also "said he was part of something south side."

Curiel's cousin, Jeremiah Bonilla, later showed up at Curiel's house. Curiel sometimes sold marijuana for Bonilla and was expecting him. When Bonilla knocked on the door, Curiel told Escalante to get rid of the gun. Bonilla came in and began weighing out marijuana. Escalante and Bonilla introduced themselves. Escalante asked whether Bonilla sold marijuana and they exchanged numbers. Escalante asked if he could purchase $400 or $500 worth of marijuana. Shortly after this conversation, Bonilla left. Eventually, Escalante and Anguiano also left.

Curiel later called Bonilla. Bonilla mentioned that he wanted to sell marijuana to Escalante in front of Curiel's house because it would be safer. Curiel told him not to trust Escalante or make a deal with him and that he had seen Escalante with a gun. Curiel tried calling Bonilla again multiple times that

evening but could not reach him. He later learned that Bonilla had been killed.

Anguiano testified that he attended middle school with Escalante and considered him a friend in July 2016. Anguiano also knew Curiel from school and they used to hang out together. In 2016, Anguiano was part of a tagging crew called KAB, which stood for Known and Blown. Escalante was also part of the crew, which would "go out[,] tag, hang out, [and] smoke [marijuana]."

According to Anguiano, on July 6, 2016, he went to Curiel's house. He asked to invite Escalante over. Anguiano had a bicycle with him, but Escalante did not. They smoked marijuana together. At some point, Escalante pulled out a semi-automatic gun, which Anguiano identified as a Glock 27. He and Curiel took pictures and video with the gun for Snapchat. Curiel told Escalante to put the gun away because his cousin was coming over. When Bonilla arrived, he had a jar of marijuana with him, which he gave to Curiel. Escalante introduced himself to Bonilla and asked for Bonilla's number because he wanted to buy marijuana.

Anguiano and Escalante left Curiel's house at around 11:00 p.m. They went to the backyard of Escalante's house, where they smoked more marijuana. Anguiano saw Escalante texting. After a couple of hours, Escalante said he was going somewhere. He took Anguiano's bicycle. Anguiano estimated that Escalante returned 20 or 30 minutes later. He no longer had the bicycle. He seemed scared and told Anguiano he had shot Curiel's cousin. Before Anguiano left, he saw Escalante with about an ounce of marijuana, which would have been worth at least $200 or $300.

6

Mariana Becerra was Bonilla's girlfriend. The night he died, Bonilla texted that he was busy at Curiel's house. Becerra texted him at 2:51 a.m. asking Bonilla why he was ignoring her. He responded, " 'Sorry, someone wants to pick up 500 rn and really persistent.' " Becerra replied, " 'Really? Who wanted to pick up at 3:00 a.m.?' " She did not receive a response.

Police officers from the Bell Police Department reported to the scene of the shooting on the morning of July 7, 2016. They observed a car that had crashed through a garage door, which was still running. The officers located Bonilla inside the car. He was in the driver's seat, deceased, and slumped towards the passenger seat. The officers secured the crime scene and questioned nearby residents. One witness later testified that she heard a man's voice say " 'whoa, whoa, whoa' " and then a gunshot. She saw a car with red lights blinking and a man leaving on a bicycle. The car had knocked down the door of a garage. Two other witnesses testified they heard three gunshots and the sound of a crash. One of them saw "a masculine person" getting on a bicycle and riding away. A fourth witness was woken up by loud arguing between two men. He heard a noise like an engine revving and a loud crash.

Bonilla was 22 years old at the time of his death. His cause of death was a gunshot wound to the chest. A criminalist specializing in firearms analysis testified that the bullets and cartridge cases recovered from the scene exhibited features consistent with Glock pistols.

Martindale reviewed surveillance video showing a bicyclist riding into the alley and pulling into an empty parking spot. Bonilla's car entered the alley shortly thereafter and parked in that same spot. The video showed a figure outside the car

7

moving from the back of the vehicle to the passenger side. The video next captured the vehicle accelerating forward and crashing through a garage door. According to Martindale, it also faintly showed the person on a bicycle exiting the parking spot where the car had been and riding away.

Martindale also reviewed the contents of Bonilla's phone. He observed a text thread between Bonilla and a phone number ending in 8080, which was registered to Escalante and was suspended several days after Bonilla was killed. The first message from Escalante's number said: " 'Enzo bro.' " The exchange concerned how much marijuana could be purchased for $500. Bonilla later asked where Escalante was and he replied with a "pin," or a map denoting a specific location, which was almost exactly where the shooting took place. The map was titled " 'Enzo Escalante's location.' " Escalante later wrote, " 'I'm right here pull up.' "

***Confessions to the Crimes***

Kevin Medina was friends with Escalante in 2016. Medina was also part of the tagging crew, KAB. Escalante had told Medina he had joined KAM about a month before July 2016. Prior to July 2016, Medina saw Escalante with a semi-automatic firearm.

On July 9 or 10, 2016, Escalante arrived at Medina's house and asked Medina to give him a ride to meet up with his aunt. He said "he was into some trouble so he needed to get out" and had been involved in a murder. Medina agreed to give him a ride. Escalante told Medina that Medina would not see him again.

While they were driving, Medina asked about the murder. Escalante said he was with a friend who wanted to steal

8

marijuana. He did not identify the friend. Escalante was involved in this plan and claimed the marijuana was a "tax." He had been the one texting the marijuana dealer. According to Escalante, when they arrived, the friend pointed a gun at the man selling marijuana, the man tried to grab the gun, and the friend shot him. The marijuana dealer was inside a car. Escalante said he grabbed the marijuana after the man was shot and told him, " 'You got taxed.' "

Karen Gurrola was Escalante's ex-girlfriend. While they were dating, Gurrola saw Escalante with at least two small firearms. Gurrola also saw a video of Escalante being "courted," or being beaten up by a group of people to become part of a gang. Escalante confirmed to Gurrola that he was a member of KAM. Gurrola ended their relationship because she did not want to be around a gang member, but they resumed contact in July 2016. Escalante called Gurrola from an unknown number and asked to meet up. When they met, Escalante informed Gurrola that he was planning to go to Mexico. Gurrola later drove to visit Escalante in Tijuana. They resumed their relationship there.

In or around November 2016, while Gurrola was visiting, Escalante told her that he had been part of a killing. Gurrola asked, " 'You killed him?' " Escalante replied that he did because the individual "wasn't doing what [Escalante] asked him to do" by giving up the marijuana he had. He identified the person as Bonilla. Escalante had been seeing Bonilla in his dreams. The killing took place in Bonilla's car. Escalante had been texting with Bonilla at around 3:00 a.m. before the killing. Bonilla offered to sell him marijuana. Escalante met with Bonilla on a bicycle in an alley, pulled a gun, and pointed it at Bonilla. Escalante told Bonilla, " 'Give me your weed.' " Bonilla declined

9

and said, " 'You're not going to kill me over weed.' " Escalante shot him. Escalante did not seem remorseful. He said he used a Glock to kill Bonilla.

Gurrola asked if this was the only thing Escalante had done. He mentioned another incident and identified the victim as Ramirez. Escalante said he killed Ramirez near a marijuana dispensary and had defended himself because Ramirez was coming towards him with a knife. Escalante did not mention Isaac. Escalante told Gurrola he got rid of the firearm he used in the killings by giving it to "the main head" of the KAM gang.[3] When Gurrola returned to the United States in December 2016, she immediately informed the Bell Police Department about the killings.

### Gang Expert Testimony

Officer Ruben Catani of the Bell Gardens Police Department worked in a gang unit for five years and testified that he was familiar with the KAM gang, or Krazy Ass Mexicans. To rise through the ranks of KAM, it is necessary for members to "put in work," or engage in crimes. Committing murder would be the fastest way to rise through the ranks. In KAM's slang, "taxing" someone means robbing them of something that the gang member can then resell. The gang member then provides this money to older members who are higher in the gang hierarchy.

According to Catani, in a video from the marijuana dispensary, Escalante threw a hand signal that appeared "very similar to the way KAM throws up their gang sign." Escalante appeared to be making a "K" with his hand, for KAM. He made this sign more than once. Catani testified that asking where one

---

[3] Forensic evidence indicated different guns were used in the Ramirez and Bonilla shootings.

is from and whether they bang or write is a gang challenge and it is reasonable for one to expect violence to follow the question. Using photograph exhibits, Catani identified tattoos related to KAM on Escalante, including "KAMSTER"; a Chevy logo, which members use to represent the Southside faction of KAM; a Rams logo, which represents KAM because the words rhyme; and the number 60, which Catani believed showed Escalante's allegiance to or membership in a particular clique within Southside KAM.

***The Underlying Proceedings***

The People charged Escalante by information with the murders of Ramirez and Bonilla (§ 187, subd. (a); counts 1 & 3, respectively), two counts of possession of a concealed firearm by a prohibited person (§ 25400, subd. (a)(2); counts 2 & 5), and second degree robbery (§ 211; count 4). The information alleged that the multiple murders charged in counts 1 and 3 were a special circumstance under section 190.2, subdivision (a)(3). It further alleged that the Bonilla murder was committed while Escalante was engaged in the commission of a robbery under section 190.2, subdivision (a)(17). In connection with counts 1, 3, and 4, the information alleged that Escalante personally used a firearm, personally and intentionally discharged a firearm, and the personal and intentional discharge of the firearm caused great bodily injury and death within the meaning of section 12022.53, subdivisions (b) through (d). Finally, as to all counts, the information alleged that Escalante had a prior serious or violent felony conviction within the meaning of section 667, subdivision (d), and section 1170.12, subdivision (b).

A jury found Escalante guilty of the second degree murder of Ramirez and the first degree murder of Bonilla. It also found Escalante guilty of two counts of having a concealed firearm by a

11

prohibited person and the second degree robbery of Bonilla. In connection with both murder counts, the jury found the multiple murder special circumstance true. In connection with the Bonilla murder, the jury found the robbery special circumstance true. With respect to the murder counts and the robbery count, the jury found the firearm enhancements true.

Escalante waived his right to trial on a strike prior in a juvenile case and admitted the allegation.

As to the Bonilla murder, the court imposed two concurrent LWOP sentences based on the two true special circumstance findings, plus 25 years to life for the firearm enhancement. As to the Ramirez murder, the court sentenced Escalante to a term of 15 years to life, doubled due to Escalante's prior serious or violent offense conviction, plus a consecutive sentence of 25 years to life for the firearm enhancement. Thus, for the murder counts, the court sentenced Escalante to a total of 80 years to life, plus the concurrent LWOP sentences. The court imposed and stayed (§ 654) sentences of 16 months for counts 2 and 5 and a sentence of two years for count 4.

## DISCUSSION

### I. The Trial Court Did Not Abuse Its Discretion by Denying the Motion to Sever

Although Escalante concedes the murder counts met the statutory requirements for joinder because they were the same class of crime, he contends the trial court erred in denying his motion to sever the counts because the murders were unrelated in their commission and their joinder deprived him of a fair trial. Escalante fails to make a clear showing of prejudice. We conclude the court did not abuse its discretion in denying the motion.

12

### A. Background

Escalante filed a motion to sever the two murder charges. He asserted there was no cross-admissible evidence and no connection between the intent or motive underlying the two offenses. He further argued joinder of the charges would prejudice him because the Bonilla killing would inflame the jury against him when considering the Ramirez killing. He also claimed prejudice because he wished to testify regarding the Ramirez killing but not the Bonilla killing, which he claimed was a weaker case.

The prosecution opposed the request and argued the multiple murder special circumstance would be impossible to prove if the same jury were not presented with evidence of both murders. It further argued the offenses were the same class of crime, Gurrola's testimony would be cross-admissible, and the incidents evinced a similar intent and common plan. The prosecution also asserted it intended to call Catani as a gang expert to provide evidence admissible in both cases to show motive, intent, and identity.

Following argument, the court observed that the two crimes were properly joined because of the multiple murder special circumstance. The court further reasoned that Gurrola's testimony would establish the marijuana robbery was a "taxation" in the context of gang activity and the evidence was cross-admissible because the Ramirez killing was also gang-related. The court therefore denied the motion.

### B. Applicable legal principles

Section 954 "provides in relevant part: 'An accusatory pleading may charge two or more different offenses *connected together in their commission*, or different statements of the same

13

offense or two or more different offenses *of the same class of crimes or offenses*, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated.' [Citation.] The statute also provides that 'the court in which a case is triable, in the interests of justice and for good cause shown, may *in its discretion* order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately.' [Citation.]" (*People v. Soper* (2009) 45 Cal.4th 759, 769 (*Soper*).) "The purpose underlying this statute is clear: joint trial 'ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.]" (*Id*. at p. 772; see also *People v. Anderson* (2018) 5 Cal.5th 372, 388 (*Anderson*) ["The law prefers trying charged offenses together because doing so ordinarily promotes efficiency"].)

  "Unlike what occurs in situations involving the admissibility of uncharged misconduct—in which the People bear the burden of establishing that the evidence has substantial probative value that clearly outweighs its inherent prejudicial effect—by contrast, in the context of properly joined offenses, '[t]he burden is reversed.' [Citation.] In the *latter* setting, '[t]he *prosecution* is *entitled* to join offenses under the circumstances specified in section 954. The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.]' " (*Soper*, *supra*, 45 Cal.4th at p. 773.) "A defendant, to establish error in a trial court's ruling declining to sever properly joined charges, must make a ' "*clear showing of prejudice*

14

to establish that the trial court *abused its discretion . . . .*" ' [Citation.]  A trial court's denial of a motion to sever properly joined charged offenses amounts to a prejudicial abuse of discretion only if that ruling ' " ' " 'falls outside the bounds of reason.' " ' " ' [Citation.]" (*Id.* at p. 774.)  We conduct a two-part inquiry to determine whether there is a clear showing of prejudice.

" 'In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' [Citation.]" (*Anderson, supra,* 5 Cal.5th at pp. 388–389.)

Second, we determine whether joinder resulted in gross unfairness to the defendant.  "[E]ven if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges actually resulted in ' " 'gross unfairness' " ' amounting to a denial of due process during the guilt phase." (*People v. Simon* (2016) 1 Cal.5th 98, 123 (*Simon*).)

"We review the trial court's decision to deny a severance motion for abuse of discretion." (*People v. Armstrong* (2016) 1 Cal.5th 432, 455–456.)

15

## C.  The trial court did not abuse its discretion in denying Escalante's severance motion

It is undisputed that the statutory requirements for joinder were met because the murders were crimes of the same class. (§ 954.)  Thus, we consider whether the court abused its discretion in denying the motion to sever the murder charges under the two-part inquiry described above.

Escalante contends there was no cross-admissible evidence. However, our Supreme Court has explained that "even the complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance.  [The court] repeatedly [has] found a trial court's denial of a motion to sever charged offenses to be a proper exercise of discretion *even when the evidence underlying the charges would not have been cross-admissible in separate trials*." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221; accord, *Anderson, supra*, 5 Cal.5th at p. 389; *Simon, supra*, 1 Cal.5th at p. 123.)  We therefore consider the other factors described above.

Escalante acknowledges that"[o]n the surface, neither murder readily appears to be more likely than the other to inflame a juror" and "the seriousness of the two street shootings is likely comparable to a lay eye."  Still, he asserts the Bonilla murder was more likely to inflame the jury because "it was calculated and not provoked in the slightest," whereas Escalante shot Ramirez after Ramirez "unilaterally inserted himself on behalf of his bullied brother and attacked Escalante . . . ." Escalante claims this is "a fact tending to justify self-defense" and makes the Ramirez killing "less egregious and inflammatory . . . ."  We disagree that Escalante's persistent harassment of a 16 year old, and his subsequent close-range shooting of the unarmed

16

man who came to his younger brother's defense, was significantly less inflammatory. Escalante's assertion that he "was not the one who initially challenged Isaac," while accurate, ignores that he followed Isaac into the marijuana dispensary, repeatedly questioned him about his gang or tagging crew affiliation, threw gang signs at him, and told Isaac he would be waiting for him outside. The record strongly indicated that Escalante intended to harm Isaac and Ramirez's actions in Isaac's defense were, at a minimum, provoked.

Escalante also contends that the Ramirez case, though less inflammatory, was stronger than the Bonilla case. The record does not support this contention. The evidence established that Escalante admitted his involvement in the Bonilla murder to Anguiano, Medina, and Gurrola. Escalante's text messages with Bonilla placed him at the scene of the crime. Although Escalante told Medina a friend was responsible for the shooting, witnesses who lived near the scene of the shooting observed only one person on a bicycle riding away from the scene.

"[A]s between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper*, *supra*, 45 Cal.4th at p. 781; accord, *People v. Johnson* (2015) 61 Cal.4th 734, 752 (*Johnson*).) The cases here were of sufficiently similar strength that joining them did not prejudice Escalante.

Finally, as noted above, the refusal to sever charges may be an abuse of discretion where any one of the charges carries the death penalty or joinder converts the entire matter into a capital

17

case.  Here, as to the Bonilla case, the People alleged a robbery special circumstance, which made Escalante eligible for the death penalty.  (§ 190.2, subd. (a)(17)(A).)  Joinder did not convert the entire matter into a capital case.  And, while we agree that the trial court was mistaken in its reasoning that the multiple murder special circumstance required the two cases to be tried together, the fact remains that, if tried separately, the People could have tried the Bonilla matter first and alleged the multiple murder circumstance in the subsequent proceedings in the Ramirez murder.  (See *Johnson*, *supra*, 61 Cal.4th at p. 752.)

In both *Simon* and *Johnson*, the prosecution pursued the death penalty (see *Simon*, *supra*, 1 Cal.5th at p. 110; *Johnson*, *supra*, 61 Cal.4th at p. 740), and our high court rejected the claim that the joinder of capital and non-capital charges was improper, reasoning that there was "less risk of prejudice" to the defendant where "one of two joined murder incidents would independently give rise to a capital charge . . . ."  (*Simon*, at p. 128; accord, *Johnson*, at p. 752.)  Here, too, the Bonilla incident would have independently given rise to a capital charge.  However, the prosecution elected *not* to seek the death penalty and did not put the issue before the jury as required by section 190.3.  Thus, the joinder of the capital and non-capital charges could not have "bolstered the possibility of [Escalante] receiving a death sentence."  (*Simon*, at p. 128.)  Moreover, when, as here, strong evidence supports each incident, neither case poses "an undue risk of unjustified conviction."  (*Id*. at p. 129.)  Joinder in this case did not "bolster the possibility of conviction," and did not bolster the possibility of a severe penalty being imposed as punishment.  (*Ibid*.)  We perceive no risk of prejudice to

Escalante resulting from the joinder of the capital and non-capital murder charges.

Although Escalante cites *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073, in the context of capital case liability, we do not find it persuasive in this case. In *Bean*, the Ninth Circuit concluded there was prejudice in joining unrelated murder charges where substantial, undisputed evidence supported the defendant's guilt in one of the cases and only fingerprint evidence, which the defendant "vigorously disputed at trial through expert testimony," supported his guilt in the second case. (*Id*. at p. 1085.) We have already rejected Escalante's claim that there was a significant disparity in the strength of the Bonilla and Ramirez cases. And, as we will discuss below, "unlike in *Bean*, there is 'affirmative evidence of the jury's ability to assess the [two incidents] separately.' [Citation.]" (*Simon*, *supra*, 1 Cal.5th at p. 131.)

We conclude the trial court's order was proper as a matter of state law. We therefore consider whether joinder resulted in gross unfairness to Escalante. "In determining whether joinder resulted in gross unfairness, [our Supreme Court] ha[s] observed that a judgment will be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Simon*, *supra*, 1 Cal.5th at pp. 129–130.)

Here, strong evidence supported both murder charges. The court instructed the jury in this case with CALCRIM No. 3515, which states that each count is a separate crime that must be considered separately, and a separate verdict must be returned for each. The jury demonstrated it was capable of differentiating between the Ramirez and Bonilla murders by returning two different verdicts, finding Escalante guilty of second degree

19

murder for the Ramirez killing and first degree murder for the Bonilla killing. As in *Soper*, this " 'suggest[ed] that the jury was capable of differentiating between defendant's various murders; no improper spillover effect is evident here.' [Citations.]" (*Soper*, *supra*, 45 Cal.4th at p. 784; accord, *Simon*, *supra*, 1 Cal.5th at p. 130 [that jury found defendant guilty of first degree murder as to one charge and second degree murder as to other " 'strongly suggests that the jury was capable of weighing the evidence and differentiating among [the] various charges' "].)

Escalante argues the jury's questions asking for definitions of first degree murder, second degree murder, and manslaughter, and whether " ' "felony robbery" automatically bump[s] it up to 1st degree murder,' " mean "the jurors had some degree of difficulty with the joined murder charges." Yet, he also concedes that these questions "do[ ] not reveal the details of the jurors' difficulties . . . ." Indeed, the jury's "difficulties" appeared to concern the law, not the facts. Escalante fails to demonstrate that joinder actually resulted in gross unfairness that amounted to a violation of his federal constitutional rights.

## II. Escalante Fails to Establish the Prosecutor's Comment Violated the Racial Justice Act

Escalante also contends the matter must be remanded because the prosecutor introduced racial bias into the trial by commenting that Escalante's skin tone was lighter at the time of trial than it appeared in photos and videos taken when the crimes were committed six years earlier. Although Escalante forfeited this claim by failing to object in the trial court, we nevertheless consider the argument and conclude the prosecutor's comment was a racially neutral and unbiased description of the

20

defendant's physical appearance, permissible under the Racial Justice Act.

### A.    Background

Defense counsel, the prosecution, and multiple witnesses commented on the differences between Escalante's appearance at the time the offenses occurred and at trial, including his skin tone.  In his opening remarks to the jury, the prosecutor told the jury they would see Snapchat photos Anguiano had taken with Escalante's gun and Escalante would appear in the background of those photos.  He stated, "By the way, folks, as we're sitting here, Mr. Escalante looks the [*sic*] very different than he did back then.  He's [*sic*] skin's lighter.  He's put on weight, shaved.  You'll hear he's the same person."

During his opening argument, Escalante's counsel observed the charged offenses took place six years earlier.  Referring to surveillance video, he told the jury, "This is how [Escalante] looked inside [the marijuana dispensary].  Lot darker.  And he was barely a teenager or . . . barely over 18.  Six years ago."  He pulled up a "better photo" of Escalante "near the time" of the offenses and similarly observed, "Different.  Long time ago.  Looks different now."

Isaac testified that he was unsure whether he saw the person who killed his brother in the courtroom.  He agreed he had previously identified his brother's killer to detectives and at a prior hearing.  When the prosecutor asked what changed, Isaac replied, "His appearance," referring to Escalante.  Isaac said Escalante was "thinner" at previous hearings but appeared to be the same person who killed Ramirez.

While cross-examining Anguiano, defense counsel asked whether Anguiano looked different in 2016.  He agreed he did.

21

Defense counsel then asked, "Of course Enzo looked different too; right?" Anguiano agreed. Defense counsel asked, "Lot lighter?" Anguiano again agreed. The prosecutor objected, and defense counsel clarified, "Skin. Skin stone [*sic*]." The court overruled the objection and Anguiano agreed with this observation.

### B. Applicable law

The Racial Justice Act provides "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) "The [Racial Justice] Act sets forth four categories of conduct, any of which, if proved [by a preponderance of the evidence], is enough to 'establish' a violation of section 745, subdivision (a)." (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147; § 745, subd. (a).)

Only one of these categories is relevant here. Escalante contends "an attorney in the case . . . used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).) " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (*Id.*, subd. (h)(4).) Subdivision (a)(2) "does not apply . . . if the

22

person speaking is giving a racially neutral and unbiased physical description of the suspect." (*Id.*, subd. (a)(2).)

"For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence. The defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section." (§ 745, subd. (b).) "If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing. A motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation. A motion that is not timely may be deemed waived, in the discretion of the court." (*Id.*, subd. (c).)

### C. The record does not support Escalante's assertion that the prosecutor violated the Racial Justice Act

As a preliminary matter, the Attorney General argues Escalante has forfeited his argument under the Racial Justice Act by failing to raise it before the trial court.[4]

His position finds support in *People v. Lashon* (2024) 98 Cal.App.5th 804 (*Lashon*). The *Lashon* court observed that the original version of the Racial Justice Act "provided that the only methods for seeking relief for racial bias after entry of judgment were by way of a petition for writ of habeas corpus or a motion under section 1473.7, in a court of competent jurisdiction.

---

[4]     The trial in this matter took place in May 2022, after section 745 became effective in January 2021. At all times since its original enactment, the statute has allowed defendants to seek relief prior to the imposition of judgment by filing a motion in the trial court.

23

[Citations.] While the Legislature provided a defendant could raise a violation of section 745 for the first time in a habeas petition [citation], there was no provision in section 745 'for raising a violation of the statute for the first time on direct appeal.' [Citation.]" (*Id*. at p. 811, fns. omitted.) The Act was later amended and "the Legislature was asked to consider whether a defendant could pursue a postjudgment section 745 claim by avenues other than a petition for writ of habeas corpus or a section 1473.7 motion." (*Id*. at p. 812.) "The Legislature responded with Assembly Bill [No.] 1118 [2023–2024 Reg. Sess.] (Stats. 2023, ch. 464), effective January 1, 2024, which now allows a defendant to seek review of a section 745 claim on direct appeal if the violation was based on the trial record. [Citation.] As an alternate method, a defendant may request a stay of the direct appeal and remand to allow the filing of a motion in the trial court." (*Ibid*.) The court noted that Assembly Bill No. 1118 "did not include any language indicating a section 745 claim could be presented on direct appeal *for the first time*." (*Ibid*.) "In the absence of such language," the court concluded that its "review of a section 745 claim, like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court." (*Ibid*.)

The *Lashon* court explained that its conclusion was supported by other provisions of the statute, including a 2022 amendment "provid[ing] that a section 745 motion shall be made in the trial court 'as soon as practicable upon the defendant learning of [an] alleged violation,' and '[a] motion that is not timely may be deemed waived, in the discretion of the court.' [Citations.]" (*Lashon*, *supra*, 98 Cal.App.5th at p. 813.)

The court reasoned the retention of "the waiver provision in subdivision (c) of section 745 . . . is consistent with the basic rationale of the forfeiture doctrine . . . ." (*Ibid*.) It observed that "[i]t makes little sense for the Legislature to prescribe a comprehensive procedure for making and adjudicating a section 745 motion at the trial level (including a specific waiver provision for untimely motions), only to allow defendants who could have but did not use that procedure (thereby preserving their claim for review) to bypass that procedure and pursue a section 745 claim for the first time on direct appeal." (*Ibid*.; accord, *People v. Singh* (2024) 103 Cal.App.5th 76, 113–115 (*Singh*).)

Escalante contends the forfeiture rule should not be applied in the context of Racial Justice Act claims because it "has never been applied evenly" and "is part of the systemic problem the [Racial Justice Act] was designed to address." He does not support this claim by reference to statutory language or legislative reports or commentaries indicating the Legislature's intent. Although not dispositive of the Legislature's intent, the author of Assembly Bill No. 1118 acknowledged that a stay of appeal to allow the trial court to rule on a Racial Justice Act claim "may be necessary to permit the trial court to rule on the claim in the first instance, and to allow the parties to fully litigate the issue" in light of general appellate rules of preservation and forfeiture of issues on direct appeal. (*Lashon, supra*, 98 Cal.App.5th at p. 814.)

Considering this discussion, the *Lashon* court "f[ound] it significant that the Legislature did not include any language to the effect that a section 745 claim may be raised on direct appeal 'for the first time,' which it could have easily done" and concluded

25

"[t]he omission of such language strongly suggests the Legislature intended to leave the issues of preservation and forfeiture of claims on direct appeal to be resolved by the courts based on long-standing procedural canons." (*Lashon*, *supra*, 98 Cal.App.5th at p. 814; *Singh*, *supra*, 103 Cal.App.5th at pp. 114–115.) We find the *Lashon* court's reasoning persuasive. Escalante forfeited the Racial Justice Act claim by failing to object in the trial court.

Escalante nonetheless contends this court should exercise its inherent discretion to reach the merits of his argument. We disagree with Escalante that a reviewing court must *always* exercise this discretion; in many instances, it may be impossible for an appellate court to fully assess a claim under the Racial Justice Act in the first instance based only on a cold record. For example, without hearing a speaker's tone of voice or observing an individual's demeanor and conduct over the course of trial, a reviewing court may be ill-positioned to determine whether "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1).)

Here, however, Escalante's claim is based solely on the language the prosecutor used in a single, undisputed statement in his opening argument. "[C]ourts have discretion to consider a new theory on appeal if it involves a legal question based on undisputed facts." (*Cox v. Griffin* (2019) 34 Cal.App.5th 440, 450.) Thus, instead of considering his ineffective assistance of counsel claim (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1014), and given the limited nature of Escalante's contention on appeal,

26

we exercise our discretion to consider the merits of Escalante's argument.

Escalante has not established a violation of the Racial Justice Act. The Racial Justice Act does not bar "a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).) Here, the People's case relied in part on photographs and videos of Escalante taken around the time the crimes occurred. The prosecutor's commentary on the differences between Escalante's appearance in the Snapchat pictures and video and his appearance at trial was not gratuitous; the pictures and other photographic and video evidence would not advance the prosecution's case if the jury did not accept that Escalante was the person shown.

The prosecutor was also not alone in observing that Escalante's appearance had changed noticeably between when the crimes occurred and trial six years later. Isaac initially had difficulty recognizing Escalante as the person he had previously identified as his brother's killer. He identified a change in Escalante's size, which the prosecutor also noted. Escalante's own counsel observed that many years had passed between the time the crimes occurred and trial and Escalante's skin tone was a "[l]ot darker" in 2016. Anguiano agreed Escalante looked different and his skin tone was a "[l]ot lighter" at the time of trial than it had been in 2016. The prosecutor's statements were almost identical to descriptions made by others and do not appear to lack neutrality or indicate racial bias or animus.[5]

---

[5] We note that Escalante's argument under the Racial Justice Act is based solely on the prosecutor's comment in his opening statement. Escalante does not contend that the

27

The circumstances here are distinguishable from those of *People v. Simmons* (2023) 96 Cal.App.5th 323 (*Simmons*). In *Simmons*, in a "lengthy and disjointed cross-examination," the prosecutor "mentioned on many occasions that appellant is a 'light-skinned' Black man and asked him to compare his skin tone to that of other people mentioned in his testimony." (*Id.* at p. 330.) As one of several examples, the prosecutor questioned the defendant about his skin tone, asking him "to confirm that he was also light skinned and that '[s]ometimes people mistake you for something other than Black.' " (*Ibid.*) The defendant agreed that he was sometimes mistaken for being another race. (*Id.* at pp. 330–331.) During her rebuttal argument, the prosecutor argued that the defendant " 'bragged about all the women he was able to fool with his good looks, and he admitted to having an ambiguous ethnic presentation and that people that don't know him think he's something other than Black.' " (*Id.* at p. 331.)

On appeal, the parties agreed the prosecutor violated the Racial Justice Act with this statement. (*Simmons*, *supra*, 96 Cal.App.5th at p. 335.) The court observed: "The comment at issue here violates subdivision (a) because it equates appellant's skin tone and 'ethnic presentation' with deception, implying that he was not a credible witness because the color of his skin fooled women and confused strangers. The suggestion that a witness is lying based on nothing more than his complexion is as baseless as it is offensive. Section 745 targets precisely this sort of racially biased language." (*Id.* at p. 336.)

In this case, the prosecutor made a single reference to Escalante's skin tone in recognition of the fact that Escalante's

references his trial counsel or the trial witness made to his skin tone violated section 745, subdivision (a)(2).

appearance had changed in the six years since the murders. Unlike the prosecutor in *Simmons*, he did not repeatedly call attention to Escalante's skin tone while questioning witnesses or during argument. Further, the prosecutor did not equate Escalante's skin tone being lighter or darker to positive or negative traits, or relate it to his membership in any racial or ethnic group. Contrary to Escalante's suggestion, nothing in the record suggests the prosecutor stated or implied that Escalante had "cleaned up his image" because his skin tone was lighter at trial, or that the prosecutor invited the jury to consider Escalante's appearance for any reason other than identification. In context, the prosecutor's comment was an attempt to neutrally describe how Escalante's appearance had changed over six years and assure the jury he was the same person. We have no basis to conclude this physical description was language that, to an objective observer, explicitly or implicitly appealed to racial bias.

Escalante has failed to establish that the prosecutor's comment violated section 745.

## III. We Direct the Trial Court to Correct the Sentencing Issues Identified by the Parties

Escalante and the Attorney General agree the court erroneously imposed two LWOP sentences on count 3 and the abstract of judgment should be amended to reflect the court's oral pronouncement that the sentence on count 5 was stayed. The Attorney General further notes that one of the multiple murder special circumstance findings must be stricken. We agree.

### A. We modify the judgment to impose a single LWOP sentence on count 3

Escalante contends the court erred in doubling the LWOP sentence for the Bonilla murder under the Three Strikes Law.

The Attorney General disputes that the court doubled the sentence under the Three Strikes Law but agrees it erroneously imposed two LWOP sentences based on the two special circumstance findings. We agree with the Attorney General's reading of the record.

Section 190.2, subdivision (a), permits the imposition of an LWOP sentence "if one *or more*" special circumstances are true. (Italics added.) Multiple true special circumstance findings do not justify additional punishment. (*People v. Montes* (2014) 58 Cal.4th 809, 874 [defendant "faced no additional punishment merely as a result of" second special circumstance true finding].) The trial court's imposition of LWOP sentences for both special circumstance findings was error.

The Attorney General observes that the abstract of judgment does not reflect the erroneous imposition of multiple LWOP terms on count 3. However, the court's oral pronouncement and its minute order reflect the imposition of two, concurrent LWOP sentences. We therefore modify the judgment to impose a single LWOP sentence on count 3, plus 25 years to life for the firearm enhancement. The abstract of judgment need not be amended with respect to this modification under the circumstances.

## B. The superfluous multiple murder special circumstance finding must be stricken

The Attorney General further argues the prosecution erred by alleging the multiple murder special circumstance in connection with both murder counts. He argues this court should strike one of the true findings.

Where an "information alleged two multiple-murder special circumstances, one in connection with each murder, and the jury

30

found both true," our high court has concluded that "only one special circumstance finding is proper" and "one of the findings should be stricken." (*People v. Avena* (1996) 13 Cal.4th 394, 425.) "In numerous cases involving the same kind of error, [the Supreme Court] ha[s] stricken the superfluous finding and concluded the defendant suffered no prejudice." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 422.) We reach the same conclusion and strike the second multiple murder finding.

### C. The abstract of judgment must be amended to reflect the trial court's stay of the sentence on count 5

Finally, Escalante and the Attorney General agree the abstract of judgment incorrectly fails to indicate that the sentence for count 5 was stayed and should be amended to reflect the trial court's oral pronouncement. We direct the trial court to amend the abstract of judgment to conform to the court's oral pronouncement. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [courts, including appellate courts, have " 'the inherent power to correct clerical errors in [their] records so as to make these records reflect the true facts' "].)

**DISPOSITION**

We modify the judgment to reflect a single LWOP sentence on count 3, plus 25 years to life for the firearm enhancement. We strike one of the two multiple-murder special-circumstance findings and direct the trial court to amend the abstract of judgment to reflect the court's oral pronouncement staying the sentence on count 5. The clerk of the superior court is to forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation. We otherwise affirm the judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:



EDMON, P. J.



BERSHON, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.